THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JEAN ST. MARTINE, Appellant.

First Department, July 26, 1990

**APPEARANCES OF COUNSEL**

*Robert M. Raciti* of counsel *(Sylvia Wertheimer* with him on

the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Lawrence K. Marks* of counsel *(Philip L. Weinstein,* attorney), for appellant.

### OPINION OF THE COURT

MILONAS, J. P.

Defendant was convicted, following a jury trial, of various counts of burglary in the first degree, attempted robbery in the first degree, criminal possession of a weapon in the second and third degrees and criminal possession of stolen property in the second degree. In that regard, the evidence clearly demonstrates that on the afternoon of July 1, 1986, defendant entered an apartment located at 240 East 24th Street in Manhattan where, armed with a stolen gun, he forced the occupants, 72-year-old Phillip Vogt and his retarded adult daughter, into a bedroom while he searched the premises for valuables. Finding nothing of substance, he departed only to be observed, about a half hour later, still in possession of a gun, on the fenced roof patio of an apartment on the sixth floor of 226 East 24th Street as he was picking pieces of glass out of the partially broken patio door. The occupant of the apartment, Karen Breen, immediately contacted the police. When the police arrived shortly thereafter, they began searching the roof and patios of the building and soon spotted defendant, who had a jacket and briefcase at his feet, standing on the patio of the apartment adjoining that of Breen. Defendant ignored the officers' orders to stop and ran down the building stairwell, leaving his jacket and briefcase behind. He was captured and brought down to the street where Breen identified defendant as the man who had invaded her patio. In addition, the briefcase was found to contain identification cards bearing defendant's photograph, a fully loaded and operable Baretta handgun, a supply of ammunition, a crowbar, two screw drivers and knives.

■ ■ On appeal, defendant challenges his conviction on three grounds, only one of which constitutes reversible error. Two of the arguments raised by defendant relate to the court's instructions to the jury. Thus, he urges that the Judge inappropriately charged that "[i]n this case, too, there was a statement made by the defendant, Jean St. Martine. The statement was made in this case to Officer Napolitano and to Officer *[sic]* Ryan. You must be convinced that any statement

the defendant made was made in a voluntary and in a truthful way." It is defendant's contention that the failure to use the word "alleged" in connection with his statement was improper since it may have led the jury to believe that the court had already determined that any statements attributed to defendant were actually made by him. However, examining the totality of the court's instructions to the jury and considering the overwhelming proof of defendant's guilt and the fact that defense counsel argued at length that defendant had not uttered the statements in question, any error was harmless beyond a reasonable doubt *(People v Crimmins,* 36 NY2d 230). As for defendant's assertion that the court was obliged to submit the lesser included offense of second degree criminal trespass with respect to the two apartments on whose patios he was seen, there is simply no reasonable view of the evidence upon which the jury could have found that defendant committed the lesser offense but not the greater *(see,* CPL 300.50 [1]; *People v Glover,* 57 NY2d 61). Certainly, it is simply incredible that an individual who has entered a locked, fenced apartment patio, carrying a loaded gun and burglar's tools, and who is observed picking glass from the door, merely intended to commit a trespass, particularly when a short time earlier, he had utilized the gun in a burglary and attempted robbery of an apartment on the next block.

Defendant's more substantial argument concerns the admission into evidence of certain inculpatory statements made by him to Officer Napolitano and Detective Ryan. While defendant concedes that he received notice within 15 days of arraignment of some of his statements, he claims that the People were improperly permitted to introduce testimony with respect to other statements about which he was not timely advised. Indeed, the voluntary disclosure form, supplied to defendant at his arraignment, stated that "Defendant asked Officer Napolitano if that was his gun; Defendant admitted to trying to rob Phil[l]ip Vogt but said that he did not get anything and that [the] old man had ulcers and a retarded daughter and that he started to cry and so defendant left him $10.00 U.S.C." Defendant subsequently served upon the People, in part, a motion to suppress any and all of his statements on the basis of involuntariness.

An evidentiary hearing was thereafter conducted in connection with his request to suppress his statements to the police, as well as physical evidence and identification testimony. Prior to the commencement of the hearing, the District Attor-

ney provided defense counsel with *Rosario* material, including, the People assert, complete copies of defendant's statements to Detective Ryan. After Officer Napolitano had testified (he was not the first witness called), the hearing was adjourned for four days, and then Detective Ryan took the stand. During the course of his testimony, he detailed certain admissions by defendant which had not been specifically outlined in the voluntary disclosure form. In any event, defendant cross-examined Detective Ryan about the circumstances under which each of defendant's statements had been obtained, and the hearing was adjourned in the midst of this cross-examination at defendant's request. Five weeks after the hearing was last adjourned, defendant moved to preclude defendant's statements to Detective Ryan on the ground that the voluntary disclosure form did not include all of defendant's statements, and, therefore, he was not given the notice mandated by CPL 710.30. The People, in response, explained that it would have been extremely difficult to summarize all of defendant's statements within 15 days of his arraignment and that the full contents of all of his comments to the police were furnished as part of the *Rosario* package supplied before the hearing began. In denying defendant's motion, the court noted that defendant had possessed copies of all of his statements for many weeks during the period of the adjourned hearing. Defendant's attorney then concluded his cross-examination of Detective Ryan, and the hearing, following additional adjournments, was completed more than two months after it had commenced. The court eventually denied defendant's motion to suppress in all respects and determined, among other things, that his statements had been voluntary beyond a reasonable doubt.

In opposition to the argument that the People failed to furnish the statutorily required notice of their intention to offer at trial evidence of defendant's statements to the police, the prosecution relies upon subdivision (3) of CPL 710.30. According to this provision: "In the absence of service of notice upon a defendant as prescribed in this section, no evidence of a kind specified in subdivision one may be received against him upon trial unless he has, despite the lack of such notice, moved to suppress such evidence and such motion has been denied and the evidence thereby rendered admissible as prescribed in subdivision two of section 710.70." However, contrary to the People's contention, the statute does not mean that the prosecution's lack of compliance with the 15-day

notice requirement is excused whenever a hearing ensues and the court ultimately renders a decision denying the motion to suppress. As the Court of Appeals observed in *People v O'Doherty* (70 NY2d 479), wherein it rejected the prosecution's attempt to avoid the consequences of an untimely notice by asserting the "[f]or good cause shown" exception contained in CPL 710.30 (2), "acceptance of the argument advanced by the People would require that permission to serve late notices be granted routinely. Such an approach would effectively abrogate the 15-day requirement and invite a return to the practice of giving notice at a much later date, even on the eve of trial. Such a result was not the Legislature's intention" (at 488).

■ ■ The exemption in CPL 710.30 (3) provides that if a defendant, notwithstanding the absence of appropriate notice, somehow becomes aware of the existence of a particular statement and moves for its suppression, the People will not be precluded from introducing this statement in the event of a favorable court ruling merely because of the technical lack of timely notice. Indeed, pursuant to the language of CPL 710.30 (3), "no evidence of a kind specified in subdivision one may be received against him upon trial unless he has, despite the lack of such notice, moved to suppress *such evidence* and such motion has been denied" (emphasis added). Clearly, the purpose of this law is to authorize admission of evidence in a situation in which a defendant is, in fact, already cognizant of the statement(s) which the People intend to use; it is not to enable the prosecution to escape from being penalized even in connection with statement(s) concerning which an accused, as occurred herein, possess no prior knowledge and of whose existence he does not learn until immediately before the commencement of the hearing or while it is in progress. Defendant, in the instant matter, did not, by seeking to suppress any and all statements, in effect waive his right to object to the admission of statements of which he was at the time of the motion still unacquainted. To construe the statute otherwise would, as the Court of Appeals noted in *People v O'Doherty (supra)* virtually eviscerate the 15-day-notice requirements in any case in which a hearing is subsequently held, probably the situation in the vast majority of occasions in which the defendant makes some sort of admission. In *People v O'Doherty,* where, significantly, a hearing was also conducted, and the trial court there denied the motion to suppress, the Court of Appeals, in reversing the conviction

and remanding the matter for a new trial, declared (70 NY2d, *supra,* at 488-489):

"Although CPL 710.30 retains as its central purpose that of providing a defendant with the opportunity to obtain a pretrial ruling on the admissibility of statements to be used against him, the 1976 amendment was designed to serve an ancillary goal—the orderly, swift and efficient determination of pretrial motions. The impetus for the amendment was the enactment of article 255 of the Criminal Procedure Law (L 1974, ch 763, § 1), the omnibus pretrial motion provisions which sought to impose order and speed on pretrial motion practice by requiring the defendant to make substantially all pretrial motions at one time, on one set of papers before one Judge, within 45 days after arraignment *(see,* CPL 255.20; Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 255.10, at 437-438). Until the 1976 amendment, however, these goals were compromised by the prosecutor's ability under CPL 710.30 to serve a notice on defendant at any time before trial, which triggered the defendant's right to make an additional pretrial motion, requiring a hearing and resulting in additional delay. It was to alleviate this problem that the 1976 amendments to CPL 710.30, requiring notice to defendant within 15 days after arraignment, along with conforming changes to CPL 255.20 and CPL 700.70, were proposed *(see,* 21st Ann Report of NY Jud Conf, 4th Ann Report by Advisory Committee on CPL, at 339-340, 348-349 [1976]).

"Thus, not only considerations of fairness to the defendant, but also concerns for the efficient conduct of criminal prosecutions underlie the Legislature's directive. The exclusionary sanction for failure to comply contained in CPL 710.30 (3) reflects a judgment that the loss of the use of the evidence is an acceptable price to pay to achieve the desired goals. Although the People complain that the price is too high and the requirements of the statute burdensome, we cannot dilute or disregard the requirements in an effort to avoid exacting the price without trespassing on the Legislature's domain and undermining the purposes of the statute."

While the People herein timely furnished a portion of defendant's statements to law enforcement officials through the voluntary disclosure form, it is undisputed that the full contents were not made available during the requisite 15-day period. However, to distinguish *People v O'Doherty (supra),* from the present situation simply because, unlike in that case,

here there was at least partial disclosure, thereby permitting, as the People urge, the prosecution to use all statements so long as it has provided some part thereof, would not only be irrational but would remove any incentive for the People's having to comply with the statutory speedy disclosure mandates. Consequently, only when a defendant moves to suppress particular statement(s) and then procures a ruling from the court may he be deemed to waive the 15-day-notice requirement as to those statements only *(see, People v Peck,* 68 NY2d 928). Otherwise, admission of the statements is barred, and the failure to give timely notice may not be deemed harmless error *(People v O'Doherty, supra).* Therefore, the People should be precluded from introducing any statements other than those mentioned in the voluntary disclosure form.

Judgment of the Supreme Court, New York County (Jerome Hornblass, J.), rendered on September 30, 1987, convicting defendant, following a jury trial, of four counts of burglary in the first degree, two counts of attempted robbery in the first degree, one count of criminal possession of a weapon in the second degree, one count of criminal possession of a weapon in the third degree and criminal possession of stolen property in the second degree and sentencing him, as a persistent violent felony offender, to concurrent indeterminate terms of imprisonment of from 22 years to life, should be reversed, on the law, and the matter remanded for a new trial.

SMITH, J. (concurring). I concur in the reversal of the judgment and the remand for a new trial because the prosecution did not give to defendant timely notice, or any valid notice, of statements intended to be used at trial and did not demonstrate good cause for failure to do so as required by CPL 710.30 (1) and (2).

Defendant was convicted of four counts of burglary in the first degree and related crimes. Defendant was given timely notice, within 15 days of his arraignment (CPL 710.30 [2]), that the People intended to introduce the following statement at trial: "Defendant asked Officer Napolitano if that was his gun; Defendant admitted to trying to rob Phil[l]ip Vogt but said that he did not get anything and that old man had ulcers and a retarded daughter and that he started to cry and so defendant left him $10.00 U.S.C."

At a hearing on the motion to suppress this statement, a police officer testified that defendant had made a number of additional statements. It suffices to read a portion of the

transcript to conclude that defendant was not given notice of the bulk of statements which he made to the police. The transcript of the suppression hearing includes the following testimony by Detective John Ryan on direct examination:

"Q. After you discussed the biographical information, what happened after that? What was discussed, if anything?

"A. I asked Mr. Martin what he was doing in the building where he was arrested.

"He replied to me something to the effect that he was there to see a friend of his, I believe named Chris.

"Q. Okay. Chris Hines?

"A. Yes.

"Q. Did he say anything else about Chris Hines?

"A. I'd have to refer to my notes.

"Q. Okay. Please do that.

"A. All right. He stated he was visiting a friend, Chris Hines, at that location 226 East 26th Street apartment 6A. The last time he was in New York she was staying at that location.

"Q. Okay. What conversation as best you can recall followed that, if any?

"A. I asked him then about—I said there was a couple of phone books that were found in the briefcase that you had. I asked him where he had obtained those phone books.

"I'd have to refer—can I refer to my notes?

"THE COURT: Go ahead. Refer to your notes. Just say I have to refer to my notes.

"A. Mr. Martin advised me that he found the phone book with Dr. Goldberger's name on the street.

"He advised me that the green book with the Korean names he purchased from a store on 43rd Street between Seventh and Eight Avenue about two months prior to the interview.

"I asked him who was the phone number that he had made a notification to, who was that number. He advised me it was somebody by the name of Paula, that he had met Paula a couple of years ago, and that he has a brother and sister that live on Staten Island.

"I then asked Mr. Martin where he got the—where he got the gun that he was found with. At that point Mr. Martin advised me that he didn't have a gun in his possession.

"I advised Mr. Martin that from my interviews of the police

involved, that according to the records there was no problem with showing that he did possess that weapon.

"At that point then he asked me, is that true? And I said yeah, according to the interview with the police had mentioned to me that, all that property that was found on the ledge of the building was his property, and that he had a very serious problem here.

"You know, then I mentioned to Mr. Martin if he cooperated in his investigation, that his cooperation would be, you know, referred to the district attorney's office for consideration.

"At that point we had a conversation about at the time there was a police officer that was killed, Scott Gardell in Queens. Mr. Martin indicated that he had information relative to the individual who murdered the police officer.

"Q. Is that individual's name Ralston?

"A. Yes. At that point I kind of stopped the interview of what he was arrested for and I conferred with my supervisor about the murder of the police officer. And we had contacted the major case squad at that point.

"Q. Was there a name of a particular individual that was from major case squad who was contacted?

"A. Yes. A Sergeant Zaroogian.

"Q. Now, did—during the course of that conversation or just prior to it, did the defendant say anything else about why he was there at the building where he was arrested?

"A. Yes. If I can refer to my notes. He made a comment at 14 hundred he was there supposed to pick up sixty-five hundred dollars from somebody named Carmine Parelli from apartment 6A on the top floor. * * *

"Q. On one of those occasions, did the defendant say anything while he was eating the food?

"A. Yes, he did.

"Q. Tell us about that?

"A. He made a remark to the effect that I'm not the world's greatest shot, but I could have easily taken out Sergeant Marron and the cop on the vent.

"Q. What time was it that he said that?

"A. That was approximately 2040 hours, which would be about twenty to nine p.m.

"MR. YUCEVICIUS: On July 2?

"THE WITNESS: That's correct. * * *

"Q. And did he say anything else about the apartment where he was arrested?

"A. Yes. At 2135 he mentioned to me that somebody by the name of Tony Champlian or Champagne he sent him to collect 6 thousand five hundred dollars from somebody named Gloria in apartment 6A.

"I asked him why he had a gun with him. And he said the piece was a persuader. * * *

"Q. Did you talk to the defendant about the burglary at 240 East 24 Street in apartment 3B there?

"MR. YUCEVICIUS: Objection, it's leading judge.

"THE COURT: Overruled.

"A. Yes, I did.

"Q. Tell us about that conversion, what did you say?

"A. I asked Mr. Martin what had happened in that location just prior to his arrest in the other building.

"If I could refer to my notes I would give you an exact quote of what he remarked about that.

"Q. Okay.

"A. His remarks to me about that incident were 'I didn't rob the guy. I didn't point the gun at him. The gun was in a shoulder holster. Guy gave me a sob story. He told me he had ulcers on his leg. Told me he had a retarded daughter and started crying. I gave him a $10 bill.' "

After the testimony of Detective Ryan, defendant sought to preclude introduction of the additional statements on the grounds that he had not been given notice of them within 15 days after his arraignment. The prosecutor opposed the motion on the grounds that a notice for some statements had been given and that the content of all of the statements had been given when *Rosario* material was turned over at the suppression hearing.

In *People v O'Doherty* (70 NY2d 479 [1987]) the Court of Appeals held that the People could not serve a late notice of intention to introduce a statement where they had not shown good cause for failing to give notice within 15 days of arraignment. There, the incriminating statement concerning a robbery case had been made to a police officer who had arrested the defendant in connection with a subsequent robbery. The police officer in the second case did not notify the police or prosecutor in the first case of the statement until five months

after the arraignment in the first case. In holding that the People had failed to give timely notice, the Court of Appeals stated that lack of prejudice was irrelevant when notice had not been given. The court stated: "Lack of prejudice to the defendant resulting from the delay does not obviate the need for the People to meet the statutory requirement of good cause before they may be permitted to serve a late notice." (70 NY2d, *supra,* at 481.)

Despite the hearing court's conclusion that the defendant had adequate notice of the additional statements, the People never gave the required statutory notice for the additional statements. In light of *People v O'Doherty (supra),* the People's arguments that the defendant was informed of the "essence" of the statements in a timely fashion, that "[it] would have been very difficult to summarize all of the statements," that the statements were turned over with *Rosario* material and that there was "no prejudice" to the defendant, are inadequate.

ROSENBERGER and ELLERIN, JJ., concur with MILONAS, J. P.; SMITH, J., concurs in a separate opinion.

Judgment, Supreme Court, New York County, rendered on September 30, 1987, unanimously reversed, on the law, and the matter remanded for a new trial.